THE STATE, EX REL. LEEB, APPELLEE, *v.* WILSON, SUPT.,
LIMA STATE HOSPITAL, APPELLANT.

[Cite as State, ex rel. Leeb, v. Wilson (1971),
27 Ohio App. 2d 1.]

(No. 1429—Decided July 21, 1971.)

*Mr. William J. Brown,* Attorney General, and *Mr. Leo J. Conway,* for appellant.

*Mr. Joseph C. Dapore* and *Mr. David Sindell,* for appellee.

COLE, J. This is an appeal from a judgment of the Common Pleas Court of Allen County in an action for ha-

beas corpus brought by an inmate of the Lima State Hospital. The petitioner who had been found not guilty by reason of insanity in a criminal action for arson and manslaughter had been placed in Lima State Hospital by virtue of the mandatory provisions of R. C. 2945.39:

"When a defendant pleads 'not guilty by reason of insanity,' and is acquitted on the sole ground of his insanity, such fact shall be found by the jury in its verdict, and it is presumed that such insanity continues. In such case the court shall forthwith direct that the accused be confined in the Lima state hospital, and shall forthwith commit him to such hospital * * * ."

This procedure being followed in the present case, it must be first noted that the status of the petitioner is that of patient and not of prisoner. The mandatory provisions quoted above are essentially the equivalent of an inquest into sanity and a determination that the accused, though not guilty of the offense charged because of insanity, is still insane and requires hospitalization. *State, ex. rel. Bricker,* v. *Griffith,* 34 Ohio Law Abs. 95.

The statute quoted (R. C. 2945.39) also provides for an administrative type of release if the board therein designated determines that the person's "sanity has been restored, and that his release will not be dangerous." This court in the case of *Yankulov* v. *Bushong, Supt.,* 80 Ohio App. 497 determined that:

"The phrase 'that his release will not be dangerous', as used in Section 13441-3, General Code (now R. C. 2945.39) concerning the necessary finding in the special proceeding therein prescribed for the release of a person confined in Lima State Hospital, means that the person's release will not be dangerous by reason of his present insanity."

In other words, the question of danger is related to the insanity as its cause. Therefore, if there is no insanity, there is no danger growing from insanity. Hence, the primary question for determination is whether sanity has been restored. If it has been, then the release follows: if it has not been, then the question of danger becomes further

related to the issue of parole and trial release. Here, the sole issue concerns the existence or non-existence of insanity.

"Where an accused is found to be presently sane it follows as a matter of law that his release will not be dangerous within the meaning of this section." (*Yankulov* case, *supra.*)

This court further held in *Rogers* v. *Bushong, Supt.,* 82 Ohio App. 209, that the administrative release of the inmate under this section is not exclusive and habeas corpus is available to determine the question of sanity. This is also explicitly provided in R. C. 2945.39.

This is also the holding of the Supreme Court in *In re Remus,* 119 Ohio St. 166. See also, *In re Webster,* 32 O. O. 26; *Yankulov* v. *Bushong, Supt., supra; Collin* v. *Campbell, Sheriff,* 4 Ohio App. 2d 42; and *McDonald* v. *Keiter, Sheriff,* 25 Ohio St. 2d 281.

The action in habeas corpus was, therefore, heard by the court below which found the petitioner to be sane and ordered her release. From this judgment, the State of Ohio, through the Attorney General representing the superintendent of the Lima State Hospital, has appealed to this court, assigning two errors: the first dealing with the admission of certain testimony and the second dealing with the sufficiency of the evidence. Since the second issue is more basic, we shall discuss the errors assigned in inverse order and deal first with the question as to the sufficiency of the evidence.

It must, of course, be stated that it is not the function of this court to retry this issue or to substitute its judgment for that of the trial court. The function of this court is to determine whether or not there was sufficient evidence (even though contradicted) before the court to justify its finding that the petitioner had been restored to sanity.

The fundamental objection raised by the state is that the medical testimony was solely concerned with "medical" insanity and that there was no testimony at all as to the existence or non-existence of "legal" insanity; *i.e.,* that

4

type of insanity which relieves responsibility for criminal conduct. This latter type of insanity has been recently twice re-defined in the same case by the Supreme Court: first in *State* v. *Staten,* 18 Ohio St. 2d 13 and later in *State* v. *Staten,* 25 Ohio St. 2d 107. In this last case, the first paragraph of the syllabus reads as follows:

"One accused of criminal conduct is not responsible for such criminal conduct if, at the time of such conduct, as a result of mental illness or defect, he does not have the capacity either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law."

This is essentially identical with the first paragraph of the syllabus of the first *Staten* case, cited above, which was decided April 9, 1969, and was the definition of insanity pertinent to the present petitioner's trial in October, 1969. This was the type of insanity which was found to justify a verdict of not guilty by reason of insanity and, hence, was the type of insanity which also required her to be placed in the Lima State Hospital as a patient. It is the State's contention that because no specific medical testimony dealt with this specific type of insanity, there was no evidence at all before the court to justify its finding.

A review of the evidence before the trial court reveals that the trial court had before it all the hospital records and evaluations as well as the specific testimony of several psychiatrists and a psychologist. The petitioner also testified in her own behalf.

1. Dr. Reshetylo, a psychiatrist at the Lima State Hospital, testified he found petitioner to be sane. He further concluded she was able to be released back into society. On cross-examination he stated she had a paranoid personality, a personality disorder, and recommended as a condition for release further treatment. He further stated that she, after admittance, had no symptoms of insanity and was not so considered at Lima State Hospital. He stated, no one could predict her future behavior.

2. John Rider, a psychiatric case worker and therapist at the hospital, testified she could function in society but would not predict her behavior, that she had profited greatly from psychiatric treatment.

3. Dr. Trevino, a psychiatrist, neurologist and consultant at the hospital, using the term insanity as equivalent to psychosis, testified the petitioner was not insane, and that it would be reasonable to believe she could make a satisfactory adjustment. He stated he did not believe she has ever been psychotic. He further said: " * * * the records indicate she was sent to Lima State Hospital until restored to reason. As far as I am concerned, Miss Leeb is restored to reason."

4. Dr. Chomyn, a staff psychiatrist at the hospital, testified that Miss Leeb was immature and of poor judgment, but she was well oriented and has no hallucinations or delusions. In his opinion she was not psychotic; she was sane (or understands) but has no will power.

5. Dr. Wilson, superintendent of the hospital, stated: "I feel she is restored to reason but requires further psychiatric treatment." However, he felt she might still be dangerous. He said: "No, I do not think she is insane." She may be dangerous because of her personality; she was not dangerous by reason of any insanity.

It is obvious from this very brief resume and extracts from the testimony that there is not only ample but unanimous medical opinion that the petitioner was not insane, at least in the medical or psychiatric context of that term which equates it (as did at least two of the doctors) with psychotic. Since she is not insane, she could not be dangerous as a result of insanity though her personality problem may require further treatment. It is clear, then, that the question before us narrows down to the relationship of medical insanity to legal insanity.

It would appear to us that legal insanity, as defined in the *Staten* cases, is the narrower term and that all who are insane within the terms of the *Staten* decisions are psychotic and insane within the meaning of the medical definition, but that by no means all who are psychotic or medically insane are legally insane to the degree necessary to relieve them of responsibility for crime. The latter is a very narrow group of the class of psychotics. Several arguments sustain this opinion:

1. In the first Staten case Justice Taft, in the opinion,

at page 18, recognized that the medical profession classified many as insane who do not fall within the class of the legally insane.

" * * * Insanity encompasses a great many mental abnormalities. Those who criticize the so-called defense of insanity in criminal cases in Ohio usually do so merely because that defense does not encompass all the mental abnormalities which medical science recognizes as encompassed within the term 'insanity.' * * *"

2. In the definition incorporated in paragraph 1 of the Syllabus of the *Staten* case, the basic precondition to the two disabilities constituting legal insanity (i.e., the capacity to know the wrongfulness of his conduct or to conform his conduct to the requirements of law) is that these disabilities must be the result of "mental illness or defect"; *i.e.*, there must be a mental illness or medical insanity first; and if this be of the type to involve either of the two criteria cited, then, there exists legal insanity.

3. In 41 American Jurisprudence 2d 541, Incompetent Persons, Sec. 2, in dealing with forms of insanity, essentially, the first criteria is classified as moral insanity," "such mental disease as destroys the ability to distinguish between right and wrong in a particular act * * * ." The second criteria is classified as "irresistible or uncontrollable impulse," "a form of insanity frequently termed 'impulsive insanity' by which a person is irresistibly impelled to the commission of an act * * *." Thus, the two criteria of legal insanity constitute sub classes within the more general class of medical insanity.

When, therefore, all testimony indicated petitioner was not insane in the medical sense or had been restored to reason, it is not only a permissible but almost a necessary inference that she was no longer insane in the legal sense. If she was not insane in this sense, the court had the duty to grant the writ of *habeas corpus. In re Remus, supra.* On this state of the record with four doctors, all on the staff of the hospital, testifying she was not medically insane or psychotic, there was evidence to justify the court's finding and judgment. The standard mentioned in the *Remus* case, *supra,* is one of reasonable certainty:

"3. The verdict of acquittal on the ground of insanity is *prima facie* evidence of the inmate's insanity, and the presumption of insanity thereafter continues; and in order to obtain his release from such hospital by writ of *habeas corpus,* the inmate has the burden of removing that presumption and of establishing with reasonable certainty his sanity."

Since there was no testimony petitioner was still insane in any sense and since the testimony was to the effect she was medically sane, from which an inference as to legal sanity had to be made, the court had sufficient evidence to justify a finding that any presumption of insanity established by the statute was overcome.

This being the case, the second assignment of error was not well taken.

Turning then to the other assignment of error, we find it directed to two occasions in which the State attempted to ask medical witnesses questions predicated upon the legal definition of insanity set forth in the first *Staten* case.

1. In the first instance, the assistant prosecuting attorney of Franklin County was permitted to cross-examine Dr. Trevino. Actually, the prosecutor was not a proper party to an *habeas corpus* proceeding but, in some manner, this hearing was combined with an administrative proceeding under R. C. 2945.39. See *In re Application of Leeb,* 26 Ohio App. 2d 123. He started by attempting to read some part of the *Staten* case, but after objection said:

"Your honor, what I propose to do is to ask this question, is to ask this witness, withdraw it. Your honor, what I propose to do is to read to this witness the definition of criminal insanity as stated by the Supreme Court of this State and ask him whether or not he can express an opinion as to whether Miss Leeb is sane or insane."

The doctor had already testified Miss Leeb had been restored to reason, that she was not psychotic, and that he did not believe she was insane in the medical sense which he equated with psychotic. The existence of legal insanity as defined in the *Staten* case is essentially a question of law. Questions directed to the criteria within that defini-

tion would be within the province of a medical expert, but to ask him to evaluate those criteria and arrive at a legal conclusion was improper, and the court below properly excluded the question. Moreover, the proper approach to expert opinion evidence is through a properly phrased hypothetical question which was not the case here.

2. In the second case this question was asked:

"Do you understand, Doctor, that in Ohio the legal requirements and definition of the term insanity is essentially the ability of the patient to distinguish between right and wrong?"

This is obviously not the legal definition of insanity under the *Staten* case, and the court properly excluded the question. The line of questioning was not pursued any further. However the court said:

"I think my comment was I would allow him to testify to Miss Leeb's condition, whether he called it legal insanity, or whatever he characterized it."

The problem of definition was not further explored.

The assignment of error is not well taken.

In passing we may note that a question could arise as to a patient no longer insane under the *Staten* definition, but still medically insane in some other manner. This problem is not, however, before us as there was no testimony Miss Leeb was insane in any manner. If she is not insane, she was entitled to her release. If she is mentally ill requiring further treatment (a term far broader than insanity), she is subject to appropriate action under R. C. 5122.11 *et seq.*

*Judgment affirmed.*

GUERNSEY, P. J., and HOFSTETTER, J., concur.

HOFSTETTER, J., of the Eleventh Appellate District, sitting by designation in the Third Appellate District.